The next matter on our calendar is Simtech v. Citibank. Good morning, Counsel. Good morning, Your Honors. May it please the Court, Peter Melamed for Simtech. I'm sort of a last-minute substitution, so this is going to be kind of interesting. Essentially what we're dealing with is the defendants in New York developed a product colloquially known as a Kiko for which they used subsidiaries in other countries to market and sell largely to small and medium-sized companies that exported goods to the United States and Europe. They would get paid typically in dollars or in euros, and then they would be forced to convert that to their local currency. And Kiko was kind of a brand-new foreign exchange product that allowed them to supposedly hedge the risks of an exchange rate fluctuation. The Kiko had a small upside but a massive potential downside. Frequently, and in this case, the downside would not kick in until well after the contract was executed. I understand that the Kikos actually bankrupted quite a few companies that entered into them in Korea. Mr. Melamed, I think we're— Yes. Well, I'll speak for myself. Sure. My colleagues are pretty intimately familiar with the underlying things here, so maybe it would help us perhaps if you turn to the major points you want to argue about why Judge Forrest got this wrong. Well, she took kind of a shotgun approach, so there are maybe 13 grounds that she used to try to dismiss the case, and it was hard for me to pick one. Pick as many as you can. Well, one issue that I think was one of the primary issues had to do with res judicata, and there are two res judicata issues. One has to do with our counts 11 through 14, and the other has to do with counts 1 through 4. For counts 11 through 14, she said the cases were barred because of an earlier action that had to do with a foreign exchange manipulation that we alleged involved traders in London, and what we said, what we believed was that the district court did not really appreciate the factual differences between those. In our reply brief, I think on page 2 of our reply brief, I laid out a chart that showed that the who, what, when, where, the motives and so forth between that case and our current case were very, very different, and that's well-established case law. What was different, the theory? No, no, everything. Facts? The facts were very different. For example, in our counts 11 through 14, the actors were in Korea. The individuals involved were all Korean, whereas in the foreign exchange manipulation case, the actors were in places like London. They were FX traders who allegedly used their text messages and chat rooms to coordinate. That's just one example, but as I said, there's a chart that we have. Which counts are you on now? 11 through 14. With respect to counts 1 to 4, we thought that the district court erred in trying to apply standard preclusive law for res judicata. There are a couple of reasons for that. Number one is we said that this is an EDGE Act case, and EDGE Act is passed through legislation. It still looks to the state law on substantive issues, and so the district court should have looked to state law, preclusive law. Under New York law, they would have looked to Korean law, what the Korean preclusive law is. Under Korean preclusive law, claims against one party would only be preclusive against that one party. There are reasons for that within the Korean system that make sense because having to do with how things like the investigative process works, how discovery works, there's very limited discovery. If you have a claim against one person and you think that someone else might be involved in Korea, you're really not able to go after that second person unless you really have the goods on them. And typically what will happen in Korea is a plaintiff will typically bring a criminal action that allows prosecutors to engage in an investigative process, and then based on that evidence, the plaintiff would then sue the defendants in Korea. One of the problems in our case is that because the defendants in question are here, the prosecutors in Korea really don't have any investigative power over those defendants. And so as a practical matter, it would have been impossible to sue in Korea. And I think that explains both the— The district judge was wrong when she decided this on the basis of res judicata? I think so, yes. Because she applied Korean res judicata? No, because she did not. She applied normal, standard American— Yeah, I understand. Yeah. And you're saying that's the error? That was the error. She should have applied Korean law. Does your brief argue that? Yes, it does. Should I move on to the next issue? Of course. Let's see. There are lots of issues. One of the issues—I'll just pick some. One of the issues that I think the district judge erred on was she said that we had failures to state a claim based on things like we said that the products were supposedly zero cost. The district judge said, well, it's unbelievable that a product could be zero cost. How can a product be zero cost? And there are plenty of reasons, business reasons, that a product can be zero cost. They could be lost leaders, for example. And, in fact, we are aware of other people for whom these products were marketed as lost leaders. There are even people for whom these products in Korea were marketed as— they were called a government-sponsored project. So the district court was really not in a position to say just because it's a zero cost, that's unbelievable. Similarly, the same problem faced the district court when it said these products were a hedge. We said that they were a hedge, and the district court said, well, that's unbelievable. And, again, I think the district court kind of stepped over its sort of gatekeeping line on a 12b-6 motion to more or less rethink facts into the complaint that there is no grounds for in the 12b-6 motion. I don't know if there's anything in particular where you have questions. It's hard for me to sort of do this in the space that we have allotted here. But if you have any questions, I would certainly appreciate them. You reserved some time for rebuttal? Yes, I did. Okay, so we'll see if we have questions then. Thank you. All right, thank you very much, Your Honors. We'll hear from Citibank. Good morning, Your Honors. May it please the Court, Dan Perry from Milbank Tweed on behalf of the various city defendants. As to the main claims, as distinguished from what we call the new fraud claims, there are three bases for dismissal. Failure to state a claim, the parties have focused on three misrepresentations. Mr. Melamed covered two of them.  And they have another problem. None of the defendants in this case actually made any of the misrepresentations. The second basis is statute of limitations. The conduct here is old, and all of the claims would be barred under Korean, the three-year Korean statute. And the third issue is claim and issue. Do we have to reach that issue? No. Any of the three bases that I've identified would dismiss the case in full. But we remanded the case the last time it was before us. Because the district judge only chose one ground and didn't look at the others. So she was careful to look at all the issues. She did hear, Your Honors, and looked at all the issues this time. And so we have a comprehensive decision that really goes through every claim and every argument. My question was only in order to affirm the judgment of the district court. We do not have to address all the issues. This panel does not have to address all the issues. That's right, Judge Hall. Any of the three suffice to dismiss this claim. The third is claim and issue preclusion. And in particular, Judge Forrest, on pages 25 and 26 of her order, goes through some of the issues that were decided in Korea. This plaintiff litigated this case, literally sued on these 15 transactions, seeking the exact same damages in Korea against Citibank Korea. They lost there. They appealed. They lost again. And they brought this case. And all it is is a second bite at the apple. And we, Judge Forrest, used issue and claim preclusion. That's a third way to dismiss the case. Simtech, I just ‑‑ Applying federal law? So we would apply federal law. She did. She applied federal law. I think that was correct. And I do think that was correct. The sort of interesting legal question is, to what extent does a federal court give preclusive effect to a foreign judgment? And if it's ‑‑ well, federal perhaps covers too much ground. First question is, do you apply domestic law, meaning U.S. broadly defined? And you say yes to that. And then the question is, federal or state? That's right, Your Honor. And I think the parties agree that if we were here on a diversity case, you would apply state law, which actually differs, at least New York state law differs from federal law. If we were here on federal question jurisdiction, for example, if they were their Sherman Act claims, we would, I believe the parties agree, apply federal law. And since we're here on EDGE Act jurisdiction, the question is do you apply federal or state law? It's not a question that I'm aware of having been decided by a circuit court. Just two arguments there. One, if you look at the EDGE Act, Section 632, on its face it says that a claim in international banking, if it meets those requirements, shall be deemed to be the district court, the federal court, shall be deemed to have jurisdiction in the same way that you would under a federal question case. So the statutory scheme seems to contemplate making international banking cases in effect federal question cases. And even moving beyond that, the purpose of the EDGE Act is to give uniformity. And uniformity of decision here, we believe, would only be accomplished through using federal law. If this case were brought in New Jersey, for example, New Jersey has the same rule that the federal courts do, which is they recognize that res judicata not only protects the litigants from double litigation, but also the courts from having to hear cases that have already been litigated and decided. And so we think that's the, Judge Forrest got it just right, that's the appropriate result here. It's not just an academic question. This plaintiff, or the law firm representing this plaintiff, after this appeal was filed, actually filed five new cases, or a case on behalf of five new plaintiffs, who were all losers of KIKO litigation in Korea. And so there is a price to not recognizing and protecting judicial economies here. There are going to be a lot more second bite at the apple. KIKO cases filed in this court, there's now a total of six plaintiffs. Well, you said five new plaintiffs. Did they sue before? They sued in Korea and lost. In other words, they're in the same place that the Simtek plaintiff is procedurally in Korea. Little differences among them, but they then waited. They saw this court's remand on the prior issue, on form of nonconvenience, and they filed a new case. That got wheeled out to Judge Rakoff. We moved to dismiss. He's indicated that he'll dismiss the case, but I think he's waiting to write an opinion until he hears what this court says on this case. Let me just move, I see I have some time, to the 12B6 arguments. There are, the notion that these were zero-cost instruments, you only need to look at the confirmations, and the confirmations are written, signed contracts. There are 15 of them. They contain an entire column that says premium. It's clear to any reader of the contract that there was going to be a cost associated with it. The suggestion that these contracts were hedges, they in fact were. This case is about a world where the dollar strengthened, which is usually a problem if you're an exporter and the dollar strengthens and you're unhedged. You've effectively found money because the dollar,  you make the product, the dollar's here. If by the time you sell the product, the dollar is up here, it's strengthened, you've effectively found money due to a currency movement. What they made a decision to do was hedge, because of course the dollar could depreciate in value, which would lead to an artificial loss. When they talk about this being a zero-hedge product, essentially the way the product was structured is if the dollar depreciated too much, Citi had the option to knock the trade out. In other words, substantial dollar depreciation, no hedge. This is a case where in the world financial crisis, the dollar strengthened measurably. When they're talking about losses, what they're really talking about is a circumstance where they wish they were unhedged, because they have dollars that are suddenly more valuable just because of currency movements. Whatever one thinks about that structure of deal, there's nothing fraudulent in the suggestion that this was a product that hedged. These plaintiffs were perfectly hedged. It didn't work out for them if you just think about it from a trading perspective. How come they lost all that money? It didn't work out for them. I think what they're saying, they say they lost $73 million. I don't know how they calculate that. I don't know if that's a lost gain. In other words, if I were unhedged, I wouldn't have lost money. I think what they're saying is this, and this isn't a fraud claim, and I think this is why they're not that transparent about it, but if you have a circumstance where you're in a global recession, they make circuit boards, and they decide to hedge, and here they hedged sometimes a year out and sometimes longer. They have an obligation to deliver currency, and if you're in a global recession and people stop buying computers and you still have an obligation to deliver currency, then you have a problem. But that's not a problem that relates to the Kiko structure or anything like that. It would be a plain vanilla currency hedge structure. You'd have the same issue. And also there's no misrepresentation that they can point to, and so they don't really make that argument. But I think when they're saying this is how we were damaged, I think that's what they were saying. They didn't have enough dollars as the global economy began to slow or crash. The dollar skyrocketed, demand for product cratered, and all of a sudden they were in a position where they had to deliver dollars, and they didn't have them. That's not a problem that has anything to do with the Kiko. That's a more fundamental problem. Weren't they told it was a no-lose proposition? Well, they don't allege that they were told it was a no-lose proposition, and no rational person could think dealing as a principal with a financial institution that it would be no-lose. What they were told was that they were told three things. So no cost, we've addressed that. It's a hedge, we've addressed that. The third thing they say they were told is we believe the dollar will depreciate, and therefore you need to enter into a hedge. So now we're in a situation where they're told the dollar's going to depreciate. A couple of problems with that theory. First of all, it's not realistic to think Citi is somehow omniscient about the currency markets. Second of all, the dollar actually did depreciate. They admit that the first several trades they entered into, they essentially came out on top because the dollar depreciated, consistent with the opinion. Third, there are legion cases that talk about this level of advice, really providing opinion from currency traders about where they think that the market's going. That is typically not actionable, and it ought not to be here. And the last point I'd make is every single one of the contracts that they signed had a very specific nonreliance clause that really prohibits them from making this argument. It's specific. It talks about them making an independent decision to enter into the trade and not relying on any advice from Citi Bank. And so putting all of those together, this really isn't a case that sounds or ought to be permitted to proceed. Thank you, counsel. Thank you. Mr. Malamud, you've reserved two minutes for rebuttal. Okay, thank you. So I'm going to try to do this quickly. I think part of the issue is how the law handles situations in which U.S. companies use foreign subsidiaries to market products that are basically designed to bring profits over here. As far as the hedging issue, the district court said, well, if a product, you know, hedges at some exchange rate to the hedge, that's not what a hedge is. A hedge is an insurance against all contingencies. This was not insurance against all contingencies. That means what a hedge is is that you take, you know that you're going to potentially lose money, but it's calculated how much you're going to lose. This was completely beyond what anyone calculated. As far as the Korean statute of limitations is concerned, which New York. It was beyond. Yeah. His point seems to be beyond related to product demand, not currency demand, that the currency fluctuation risk was hedged, but that the market for the product. No, no. That's not his point. No, it was that the currency, in order, if something's a hedge, it's to hedge a currency fluctuation. And the problem with this is that rather than narrowing your risk, it actually expanded your risk. One other thing, all of the contracts were in English, and yet they were sold from Koreans to Koreans in Korea, and the contracts in English were only given like four days after people actually entered into the contract. So the normal reading of an English language contract doesn't work in this situation. They signed them. They were in English. Yeah. Well, that's partly because of the type of relationship that banks have in Korea. Banks are viewed differently in Korea, and typically people view them as an advisor, and that's what happened here. So they misunderstood Citibank's role? That's correct, yes. As far as issue preclusion, I think we say why the claims are different in the joint appendix, pages 525 to 535. And then as far as claim preclusion is concerned, even if we were to apply, even if we were to look at federal preclusive law, I think that there are a lot of good reasons in this case, and I explained them in my initial eight minutes that we should look at Korean law, that the federal courts should choose Korean law because the Korean preclusive law makes sense within the entire Korean system about how you can easily sue one person, but just because you suspect another person was involved, you can't sue them as a practical matter in Korea. I want to rebut everything, but I don't have time. Thank you. All right, well, thank you very much, Your Honors. Thank you both. We'll reserve decision. That is the last case that's on our argument calendar, so I will ask the clerk to adjourn court. Court is adjourned.